1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :        Case No. 1:12-cr-3
                              :
                              :
KIM DOTCOM, et al.,           :
              Defendants.     :
                              :
------------------------------:
```

HEARING ON MOTIONS

June 29, 2012

Before:  Liam O'Grady, USDC Judge

APPEARANCES:


Jay V. Prabhu, Andrew Peterson and Ryan K. Dickey,
Counsel for the United States


Ira P. Rothken, William A. Burck, Derek L. Shaffer and
Heather H. Martin, Counsel for Defendant Megaupload


Craig C. Reilly,
Counsel for Defendants Ortmann, Van der Kolk and Batato


Marc J. Zwillinger, Counsel for Carpathia


Julie P. Samuels, Abraham D. Sofaer and John S. Davis,
Counsel for Kyle Goodwin


Julie M. Carpenter, Counsel for MPAA

3

<u>INDEX</u>

STATEMENTS BY

  MR.  PETERSON                                    6
  MR.  PRABHU                                      16
  MR.  ZWILLINGER                                  17
  MS.  SAMUELS                                     19
  MR.  PETERSON                                    24
  MR.  ZWILLINGER                                  27
  MR.  SOFAER                                      28
  MR.  ROTHKEN                                     30
  MR.  PETERSON                                    33
  MS.  SAMUELS                                     40
  MR.  ROTHKEN                                     42

4

```
 1              THE CLERK:  Criminal case number 1:12-cr-3, the
 2   United States of America versus Kim Dotcom, et al.
 3              MR. PRABHU:  Good morning, Your Honor.  Jay Prabhu,
 4   Ryan Dickey and Andrew Peterson for the Government.
 5              THE COURT:  All right, good morning.
 6              MS. MARTIN:  Good morning, Your Honor.  Heather
 7   Martin from Quinn Emanuel Urquhart & Sullivan.  With me at
 8   counsel table is Bill Burck, Derek Shaffer, both also from
 9   Quinn Emanuel, and Ira Rothken from the Rothken Law Firm.
10              THE COURT:  All right, good morning to each of you.
11              Good morning, Mr. Reilly.
12              MR. REILLY:  Good morning, Your Honor.
13              MS. SAMUELS:  Good morning, Your Honor.  Julie
14   Samuels, along with Abe Sofaer and John Davis on behalf of Kyle
15   Goodwin.
16              THE COURT:  All right.  Good morning.
17              All right, is that all?
18              MS. CARPENTER:  A couple more, Your Honor.
19              THE COURT:  Yes, ma'am.
20              MS. CARPENTER:  Your Honor, Julie Carpenter on behalf
21   of the MPAA.
22              THE COURT:  All right, good morning to you.
23              MR. ZWILLINGER:  Good morning, Your Honor.  Marc
24   Zwillinger on behalf of Carpathia.
25              THE COURT:  All right, good morning.
```

1          We were going to address the Goodwin motion, and I

2     realized that there had been briefs filed by other parties.

3     And I appreciate other entities being here.  So, maybe we can

4     further the investigation of what happened and what we are

5     going to do about it.

6          And let me say from the beginning, I am not persuaded

7     that we should be addressing the forfeiture argument being made

8     under the RICO statute, 1963, Title 18, but I am interested in

9     the Rule 41(g) motion.

10         And what I guess I would like to start out is by

11     trying to figure out what happened on the date of the seizure

12     and why the servers were not re-engaged to the hard drives and

13     what occurred subsequent to the seizure, the sampling done by

14     the Government, and then a return of the data by the Government

15     back to Carpathia.  And then perhaps get into some related

16     questions.

17         And under Rule 41, you know, the Ninth Circuit, of

18     course, has done a good bit of work on not only what

19     constitutes a seizure, but when the Court should exercise its

20     equitable jurisdiction.  And their four-part test, although it

21     hasn't been adopted by the Fourth Circuit, has received some

22     support from the Fifth Circuit in the Ramsden case and the

23     Seventh and Tenth Circuit, and Second Circuit, I believe.  So,

24     there is some support for the four-part test.

25         And I am also interested in the agreement between

1    Megaupload and Mr. Goodwin concerning whether there has been a

2    disclaimer made by Megaupload as to the reliability of the data

3    remaining in its, on its site and stored.

4            And what I don't have, I don't believe I have a copy

5    of the agreement.  I may have lost it somewhere along the line.

6    But I don't fully understand the contractual agreement between

7    Mr. Goodwin and Megaupload, if there was a formal agreement to

8    begin with.

9            So, why don't I have the Government get up first and

10   tell me what they did in the seizure, what its impact was to

11   the ability to access the Megaupload Web site.  And also, of

12   course, the effect of the seizure of the domain names.

13           MR. PETERSON:  I can at least speak to that first,

14   Your Honor.  And I am going to begin with an apology in the

15   sense that based on what Your Honor has just said, it appears

16   that the Court would like to engage in some substantial fact

17   finding today.  And although I can discuss sort of broad

18   outlines of what occurred, if the Court decides that equity

19   jurisdiction under Rule 41(g) is appropriate, the rule does

20   require the Court to hold a hearing to find facts.  And it is

21   at least the Government's belief that we should have such a

22   fact-finding hearing on another day when the Government could

23   call witnesses or present the full amount of information.

24           So, what I will be able to describe to the Court

25   today is basically an attorney proffer, but it may not be

1    sufficiently detailed for the Court in terms of some of the

2    information that is available.

3              THE COURT:  All right.  I understand.

4              MR. PETERSON:  In terms of the two questions the

5    Court just asked about what happened, I think there are two

6    separate seizure warrants or search warrants that are at issue

7    here.  The first would be the seizure of the Megaupload domain,

8    that was a seizure warrant to restrain that as a tangible asset

9    of Megaupload, LLC that was subject to forfeiture.  It is of

10   monetary value.  So, that domain was seized.

11             That warrant is served on the domain provider, and it

12   can frequently result in the domain being inactive or that the

13   domain is not available to the standard Internet user.

14             The separate set of warrants would be the search

15   warrants that were served at Carpathia Hosting where agents

16   actually physically entered the server building and imaged

17   servers that had been leased by Megaupload under a contract

18   with Carpathia.  Those servers, to be soundly forensically

19   imaged, were taken offline and--  Well, there were

20   approximately 1,100 servers.  And as we state in our motion in

21   previous briefing to the Court, not all 1,100 servers were

22   imaged.  It simply would have taken too much time.

23             Instead, the Government first tried to identify

24   servers that would have directories or information about files

25   that the Government believed it needed to seize as subject to

1    the search warrant and identified those, imaged those servers,

2    and then attempted to locate other files that the Government

3    believed were evidence of the crimes charged in the indictment

4    as well--  Well, at the time evidence of crimes that were in

5    the search warrant, were supported by the search warrant.

6              Those files, it took approximately seven days to

7    image those servers.  But the various servers that were imaged,

8    individual servers were taken offline.  At which time at the

9    end of that process, the Government left the site.

10             The Government, as far as I am aware--  And again, I

11   think this would have to be a more detailed discussion from the

12   agents or individuals who are here that represent Carpathia or

13   others, may know more details about the actual physical, what

14   happened in the server farm, I was not there so I can't speak

15   to that with great specificity.  But the servers remained in

16   the Carpathia facility.  I do not know if they were powered on

17   or off at that time.

18             But the Government never took any of those servers.

19   It only took the images of the files that it had identified as

20   subject to the warrant.  And it removed those from Carpathia,

21   just the images.

22             So, at the conclusion--

23             THE COURT:  So, the seizure of the domain names

24   prevented access to the data on the servers at least in the

25   short term, is that correct?

1        MR. PETERSON:  At least temporarily.  In the sense

2   that a person with knowledge or ability could in theory have

3   created or registered a new domain that had technical expertise

4   that is certainly beyond my ken could have potentially made

5   that data available.  The data was not destroyed or wiped or

6   anything like that.

7        However, the Megaupload URL, megaupload.com, had been

8   seized.  And my understanding, both from Mr. Goodwin's

9   affidavit and others, is that after that restraining order was

10  in place, if someone typed in megaupload.com, that Web site

11  would not have been available to the average user because the

12  domain itself had been restrained subject to a seizure warrant.

13       THE COURT:  Was there anything that prevented

14  Megaupload from modifying its domain name and permitting access

15  by third parties thereafter?

16       MR. PETERSON:  Well, I think potentially if

17  Megaupload had attempted to modify its domain name and provide

18  the same service which the Government believes was criminal, at

19  the time I wouldn't think that we would have no problem with

20  that.

21       However, as a technical matter, only the

22  megaupload.com domain or any other, there were a couple

23  associated URLS and other domains that were also seized, I

24  believe.  Only those were restrained.  It was only the ones

25  that were the subject of the restraining order.  Other domains

1    could have done that.

2           Practically, however, I'm not sure that that would,

3    was available at the time.  I mean, obviously there were other

4    things going on, including the return of the indictment that

5    were affecting Megaupload, LLC and the individuals named in the

6    indictment.  So, even if it was possible as a legal matter, I

7    am not sure practically the effect it would, or it was

8    available at least during that period of time.

9           THE COURT:  All right.  So, for a week the Government

10   does a sampling, they are satisfied they have got what they

11   need, and they return the control of the hard drives back to

12   Carpathia.

13          In order to do that search, the servers were taken

14   out of operation, is that correct?

15          MR. PETERSON:  That's correct.  To create a forensic

16   image, basically, typically they want to unplug the server so

17   that it's not in a state where the hard drive may be being

18   written so they can get an exact duplicate copy.  So, those

19   servers had to be taken offline.

20          THE COURT:  All right.  Was there anything that

21   prevented the servers from being placed back online after the

22   Government completed its search?

23          MR. PETERSON:  Certainly not from the Government's

24   perspective in the sense that there was no warrant that

25   compelled that.  There was no order that prevented those things

1    from being brought back online.

2            From my understanding, it potentially was the

3    inability of Megaupload to pay for the service which may have

4    been the result of another restraining order or restraints on

5    Megaupload's assets, but there were certainly no direct

6    prohibition from a court order or any other requirement by the

7    Government that those servers, that anything happen to those

8    servers.

9            In fact, the letter that was filed with the Court on

10   January 27 said basically, the Government's interests in these,

11   because we have executed the warrants and seized the evidence

12   that we believe is subject to seizure, that our interest in

13   them has terminated.

14           THE COURT:  All right.  And there was nothing that

15   the Government ordered Carpathia to do which affected its

16   ability to operate its servers or the hard drives?

17           MR. PETERSON:  There was no order issued from the

18   Government or the Court that I am aware of that required

19   Carpathia to do anything with those hard drives.

20           THE COURT:  All right.  Anything else on that?

21           MR. PETERSON:  In terms of the facts, I mean, that's

22   basically the extent of the knowledge that I can proffer for

23   the Government.

24           I do also, one other area, I have a copy of the

25   Megaupload terms of service that was seized at the time the

1  search warrant was executed.  It is undated.  And I can pass

2  that up to the Court.

3          Again, that's the best I can do today in terms of

4  evidentiary value, if the Government is interested in what the

5  terms of service were, but that's the most I can represent is

6  that it was seized from the servers on that date.

7          THE COURT:  What does it say regarding any

8  disclaimers?

9          MR. PETERSON:  There are a series of disclaimers,

10  Your Honor.  I think, at least in the copy of the one that we

11  have, for instance, paragraph 9 says there is no warranty.  You

12  expressly understand that your use of the service is at your

13  sole risk.  Megaupload services are provided on an as-is and

14  as-available basis.  Megaupload and its suppliers to the

15  fullest extent permitted by law disclaim all warranties,

16  including but not limited to warranties of title, fitness for a

17  particular purpose, merchantability and noninfringement.

18  Megaupload and its suppliers make no warranties about the

19  accuracy, reliability, completeness or timeliness of our

20  services, software or content.

21          The paragraph continues substantially.

22          There is also a paragraph on termination which states

23  that without limiting other remedies, Megaupload may

24  immediately issue a warning, suspend or terminate the

25  customer's account and refuse to provide services to the

13

1    customer.  And then there is a list of reasons.

2           Megaupload may also in its sole discretion and at any

3    time discontinue providing the service or any part thereof with

4    or without notice.

5           Again, there is additional, I don't want to read the

6    entire thing, it's somewhat lengthy.  But I think those are the

7    most relevant interpretations.

8           So, those are the, or at least those are the relevant

9    paragraphs I think.  There may be other potentially relevant

10   paragraphs, but I think those are the most specifically that

11   responds to the Court's question.

12          THE COURT:  Do you want to address the argument that

13   41(g) requires the Government to provide the equitable relief

14   that is being sought?

15          MR. PETERSON:  I would, Your Honor.  I think that

16   equitable relief is not available under Rule 41(g) for a number

17   of reasons.  The first one is that the Government does not

18   possess the property at issue.

19          Rule 41(g) outlines a specific remedy, which is the

20   return of the property.  And the Fourth Circuit in United

21   States versus Jones has said that the Government has not waived

22   sovereign immunity for other remedies, such as monetary damages

23   or even for restitution.  The Seventh Circuit has said there is

24   no restitution if it requires funds to be paid out of the

25   Treasury.  The Fourth Circuit has said there is no monetary

1    damages in <u>United States versus Jones</u>.

2         Here that remedy is unavailable because the

3    Government does not have the property at issue to return.

4         THE COURT:  Well, if it seized it and it rendered it

5    useless, even if it's been, you know, returned, if it has been

6    meaningfully damaged and can't be used, then the Government can

7    be held responsible for that, can't they?

8         MR. PETERSON:  I think that's possible, Your Honor,

9    but I think one of the difficulties here is that what is

10   actually at issue I think is a service by Megaupload.  There is

11   no--  Mr. Goodwin, at least to this point, has not--  The data,

12   we believe, is housed on a server that is owned by Carpathia.

13   Megaupload's interest in that physical box is subservient to

14   the lease between Megaupload and Carpathia.  And Mr. Goodwin's

15   right, if any, is subservient to the lease, that lease.  He has

16   got a separate lease with Megaupload.

17        It's not clear to me that that service creates a

18   right that is enforceable.

19        The other issue is that his argument, the argument at

20   least as stated in the reply is that there has been a Fourth

21   Amendment seizure because it's impinged access.  But in the

22   concept of a brick and mortar search, when the Government

23   secures a home for a security sweep or anything else like that

24   and then leaves with certain items, the Government is not

25   liable under Rule 41(g), nor is there a motion for return, for

1   the brief temporary period where the whole house was seized.

2   It's the things that the Government took that were the subject

3   of seizure and return.

4          And I think a good analogy here is that if Mr.

5   Goodwin had a computer in his home, let's say he had a roommate

6   who was using that computer for illicit means, for a crime, and

7   the Government executed a Rule 41 search warrant and seized the

8   computer.  Just like in this case, Mr. Goodwin would not have

9   the ability to access any of his files stored with a digital

10  service because the computer had been taken from him.  And

11  maybe he couldn't afford another computer.  Maybe he lived in

12  an area where it was difficult for him to get other access.

13         But in the Government's view, there is not a cause of

14  action under Rule 41 or the Court's equitable jurisdiction to

15  return or basically for the Government to operate the service

16  in a means that allows Mr. Goodwin to reaccess his data.

17  Especially when, as Your Honor rightly asked about the terms of

18  service, the usefulness of the service was entirely disclaimed.

19         In the Government's view, Mr. Goodwin may have a

20  claim against Megaupload, or he may in fact be a general

21  unsecured creditor of Megaupload, and there may be other

22  individuals like him, but that's why the appropriate way for

23  the Court to deal with that is not under equitable jurisdiction

24  or under Rule 41 when the Government is not in possession, but

25  in fact that Section 1960, if the funds are in fact restrained

1    or subject to forfeiture, is the appropriate way that other

2    third party folks who have interest in Megaupload's assets--

3    Because when we start talking about access, I don't think we're

4    talking about the actual property at issue, but instead about

5    Megaupload's assets and whether the Court will disburse them to

6    pay for a person to rebuild the service and operate it in a way

7    to retrieve it.  That the proceeding under either Section 1960

8    or Section 853, the ancillary proceeding after the entry of a

9    forfeiture order is the appropriate way for third parties and

10   unsecured creditors like Mr. Goodwin to vindicate those

11   interests.

12           THE COURT:  All right.  Thank you, Mr. Peterson.

13           MR. PRABHU:  Your Honor, may I clarify one point?

14           THE COURT:  Yes, sir.

15           MR. PRABHU:  Mr. Peterson was correct in that for

16   forensic reasons the servers were taken offline immediately

17   upon arrival of the agents.  And they negotiated with Carpathia

18   Hosting to disconnect the servers from the Internet at that

19   point.  And that was so no one could remote access into the

20   servers and alter any of the evidence.

21           So, that was the initial stage.  And the servers were

22   left on and remained on for I think several months.  So, they

23   were not turned off until, as the Court is aware, Carpathia

24   made the decision that they were going to move those from the

25   hosting facility at Equinix, which is actually the owner of the

1    building, to another site owned by Carpathia.

2           And just to clarify another point, after the

3    Government finished its search, there were discussions with

4    Carpathia about the next steps.  And we advised them that they

5    were free to do with those servers what they wanted.  And

6    that's when I filed our letter with the court.

7           We did discuss that they might have potential

8    liability if they turned those servers back on and connected

9    them to the Internet, but we had no order from the court, we

10   certainly had no ability to prevent them from doing that.  But

11   we did advise them of the risk of that given that there was an

12   allegation of infringement using those servers.

13          THE COURT:  All right.  Thank you.

14          Why don't I hear from Carpathia to the extent you may

15   agree or disagree with the representations.  And I understand

16   all this may be for just preliminarily setting up what may be a

17   more formal hearing down the road.

18          Good morning.

19          MR. ZWILLINGER:  Yes, Your Honor.  And with the same

20   caveat that this would be an attempt of an attorney proffer

21   rather than making myself a factual witness for the hearing.

22          I think the clarification that the Government just

23   issued was an important one.  There was an instruction to

24   Carpathia that during the execution of the warrant, which took

25   place at the Equinix data center and not at Carpathia's offices

1   for these purposes, that the connection to the Internet should

2   be terminated and that there should be no, Carpathia should

3   take steps to prevent any other party from being able to access

4   the servers.

5           I understand Mr. Prabhu's representation is that was

6   for the duration of the warrant execution, but it's not quite

7   fair to say that Carpathia was then told we could do what we

8   wanted with the servers.  In fact, as this Court knows, we had

9   wanted to transfer the servers to Mega pursuant to an

10  agreement, and the Government objected.

11          That same objection would have clearly been the case

12  had we turned them back on, given Mega access to them remotely

13  as opposed to handing them the physical servers.

14          So, we felt that between the Government's objection

15  to our suggestion that we transfer the servers to Mega and

16  between their advice to us that we would be taking on

17  significant risk of liability given what was contained in the

18  indictment, that we were not free to turn the servers back on.

19          THE COURT:  Okay.

20          MR. ZWILLINGER:  When I say back on, Mr. Prabhu is of

21  course right, they were powered, but they weren't connected to

22  the Internet.

23          THE COURT:  And my question to Mr. Peterson about the

24  ability of Megaupload or Carpathia to make the stored

25  information available through another domain name, another

1    window, another operating system, what is your response to

2    that?

3            MR. ZWILLINGER:  I think the correct answer to that,

4    and this is subject to my knowledge as well, is that they could

5    have done so by changing the domain names and repointing, you

6    know, repointing something at the servers if the servers were

7    connected to the Internet.  But without the servers being

8    connected to the Internet, registering another domain or

9    repointing them probably would have had no effect.

10           THE COURT:  All right.  Okay.  Thank you.

11           Let's hear from Mr. Goodwin's counsel.

12           MS. SAMUELS:  Thank you, Your Honor.  As a

13   preliminary matter, I would like to point out that the warrants

14   are still under seal.  I am not sure if the Court is aware.

15           So, we don't really know what exactly happened.  And

16   actually, I have learned a lot today already, which has been

17   helpful.

18           But in addition, I would also like to point out that

19   yesterday the High Court of New Zealand issued a ruling, I am

20   not sure if the Court is aware, and I have copies of it,

21   surrounding the warrants and the seizures and the searches that

22   happened in New Zealand.

23           THE COURT:  In New Zealand.  I am aware of them.

24           MS. SAMUELS:  There was a lot of really interesting

25   stuff in there.  And first of all, it gives us reason to be

1  slightly concerned about what might be in the warrants here

2  without having seen them.

3       And moreover, I think it underlies, underlines this

4  sense of urgency for innocent third parties like Mr. Goodwin

5  because I think it is fair to say that whatever is happening in

6  New Zealand, is going to be slowing down the underlying

7  criminal case here.

8       THE COURT:  Well, we are all total speculation on

9  that one.

10       MS. SAMUELS:  Sure.  But in the meantime, of course,

11  the harm is accruing to Mr. Goodwin and to other innocent third

12  parties.

13       And I should also point out that we are definitely in

14  favor of having an evidentiary hearing under 41(g) figuring out

15  what really happened here.  And that's something that we would

16  be happy to participate in and help move forward.  I am not

17  sure the form it would take.

18       I am happy to discuss, to go into a little bit the

19  terms of service issue or any other issues, but, of course, I

20  don't have any knowledge of what happened with regard to the

21  searches.

22       THE COURT:  Right.  No, I would like to--  You have

23  got a--  Was there a contractual agreement?  The warranty was

24  the warranty that Mr. Goodwin agreed to about the same as that

25  which Mr. Peterson referenced that was on the system at the

1    time?

2            MS. SAMUELS:  Well, Your Honor, my understanding is,

3    or I happen to know from my client that he does not have the

4    copy of the exact terms of service as it existed when he signed

5    up for the Megaupload service.  I have been operating under the

6    assumption that the terms are similar to what the Government

7    entered because that's what I have as well.

8            And I think that it's not fair for the Government to

9    be able to stand in the shoes of Megaupload in that case.  Mr.

10   Goodwin paid money for a subscription and then he entered into

11   a contract for consideration with Megaupload, which was

12   operating as an ongoing business entity.  And Mr. Goodwin had

13   reason to believe that it would operate pursuant to running a

14   business.

15           Megaupload maybe could have shut off service

16   immediately, but I don't think the Government can shut off

17   service immediately and then claim that Mr. Goodwin had reason

18   to think that the Government would shut it done unexpectedly

19   like that.

20           THE COURT:  Why doesn't his relief then lie in

21   contract and suing Megaupload or Carpathia for his business

22   loss?

23           MS. SAMUELS:  Well, as a practical matter, I think

24   that is--  First of all, I think that as an equitable matter,

25   this Court may order the Government to kind of, if you will,

1    provide the keys to access.  And the Government has been the

2    party who stood in the way.  And I think--

3              THE COURT:  Well, the Government is not standing in

4    the way.  The Government has encouraged the parties to try and

5    work out an arrangement where innocent third parties such as

6    Mr. Goodwin could retrieve their data.  They just believe that

7    the assets that they have seized and believe are subject to

8    forfeiture shouldn't be used because they are not Megaupload's

9    and they are not Carpathia's.  They are the potential assets of

10   those who have been injured by the infringement of Megaupload.

11   And so, they have resisted making the funds available for that

12   reason.

13             MS. SAMUELS:  With due respect, Your Honor, I don't

14   think they have encouraged the parties to work together to

15   provide third-party access.  First of all, they objected to the

16   agreement between Megaupload and Carpathia.  Which, admittedly,

17   was to preservation, not to access.  But this was the parties

18   trying to work together to figure out what to do with the data.

19   And the Government has stood in the way of that.

20             And I think when we even just talk about the domain

21   names, that's a perfect example.  When the domain name came

22   down, Mr. Goodwin lost access.

23             To expect third parties like Mr. Goodwin to come into

24   federal court, file lawsuits against Carpathia and against

25   Megaupload, who, as I believe the record shows, don't even have

1    the tools to provide Mr. Goodwin with his property, is,

2    frankly, almost unrealistic and puts quite a burden on these

3    innocent third parties.

4           And I don't think that's something we want to

5    incentivize, especially because there are tens, if not hundreds

6    of thousands, probably millions of innocent third parties who

7    have lost data.  And I don't think we want a flurry of those

8    types of lawsuits.

9           I think that much of what Your Honor is discussing is

10   indicative of the fact that we're talking about digital

11   property.  It is slightly different, of course, in many ways

12   very different from how we have dealt with these issues in the

13   past because of the nature of the property.  So, they are tough

14   questions.  I mean, there is no doubt about that.  But I think

15   that it's important that we figure out a way to get these

16   individuals their property back.

17          Mr. Goodwin is not looking for money damages, he's

18   not.  He wants his files.

19          THE COURT:  Well, as you know, I have been urging the

20   parties to do just what you have asked for quite a while, and

21   it hasn't worked out yet.  And even though I have got the best

22   negotiator in the universe I think in Judge Anderson working on

23   it, we haven't been successful to date.

24          All right.  Thank you.  I will hear anything else you

25   wanted to say about--

1      MS. SAMUELS:  Well, I have plenty more in my notes,

2 but I think that's what's relevant to what we have discussed

3 today, Your Honor.

4      THE COURT:  All right, thank you.

5      MS. SAMUELS:  Thank you.

6      THE COURT:  Does anybody else want to be heard on

7 this portion of the motion?  I think I want to limit our

8 discussion today to the issues that Mr. Goodwin has raised.

9 And I understand that if we are going to go down the Rule 41

10 road, that an evidentiary hearing is required.

11      What's the Government's position on whether it--  I

12 know we've talked a little bit about the nature of the seizure.

13 And, Mr. Peterson, do you want to be heard further on what you

14 believe the Government's responsibility is today for the stored

15 data and its retrieval?

16      MR. PETERSON:  Well, I think the point I wanted to

17 make briefly was that it's important, especially if the Court

18 is considering Rule 41(g) versus the forfeiture statutes, that

19 the specific property or property interest be defined, mostly

20 by the claimants.  Because, for instance, if the issue is the

21 megaupload.com domain, that domain is an asset subject to

22 forfeiture and, therefore, claims related to interest in that

23 domain would be barred pending the entry of a final order of

24 forfeiture.

25      If the property at issue is separate property under

1    Rule 41(g), it's not clear that that bar is the same or

2    similar, although claims under Rule 41(g) are barred by those

3    sections if they are claims into assets subject to forfeiture.

4           But I think everyone agrees at least that the servers

5    that host the data are not assets subject to forfeiture, they

6    have been the subject of a restraining order or restraint

7    pending forfeiture as the Megaupload domain potentially is or

8    any liquid Megaupload assets that have been seized pursuant to

9    that.

10          So, in terms of--  That's the first point, that

11   specificity is important because it will govern how we proceed.

12          And as to the domain, the Government does not believe

13   an evidentiary hearing would be appropriate because that is

14   barred by the forfeiture statute.

15          THE COURT:  Right, I don't argue with that.

16          MR. PETERSON:  So, in terms--

17          THE COURT:  All right.

18          MR. PETERSON:  Sorry.

19          THE COURT:  All right.  So, we focus on whether the

20   Government's actions constitute a seizure, even though it was a

21   temporary seizure, because of the meaningful interference with

22   a third party, innocent third party's possessory interest in

23   the property.  And where do we go from there?

24          MR. PETERSON:  I think the Government believes that

25   what Megaupload provided was a service.  And that the way that

1   individuals who have contracted for a service receive

2   recompense, that they are general unsecured creditors of the

3   business--  And there is a few cases that talk about that in

4   the context of the bankruptcy code, that an individual who has

5   a contract for a service--  Mr. Goodwin paid for two years of a

6   membership of a service for Megaupload's services.  It is a

7   terms of service agreement where Megaupload describes the

8   services.  And that those are general unsecured creditors that

9   may have claims against the assets of the business and could,

10  after assets are forfeited and the ancillary proceeding is

11  held, have rights to those, could receive disbursements or

12  anything else, but that they are unsecured creditors.

13          That what is held by the property at issue is

14  Carpathia's property.  And that that property is not subject to

15  forfeiture.  And if there is a claim, it's a claim against

16  Megaupload or someone else.  And thus, they have a remedy at

17  law to vindicate that interest.

18          And I think that's true even if--  In the reply brief

19  they cite a Fourth Circuit case that discusses meaningful

20  restraints on property.  It is a real property case, but it's a

21  civil cause of action, it's a Title 42, Section 1983 action

22  that is a remedy at law that, if they believe that's true, is

23  available.

24          Now, the Government was acting here at all times

25  pursuant to search warrants and seizure warrants issued by

1  courts under probable cause.  So, we believe all the actions

2  taken here were certainly reasonable under the Fourth

3  Amendment, but that there is no grounds for this Court to

4  exercise equity jurisdiction to try to accomplish that given

5  the fact that numerous legal remedies exist for Mr. Goodwin to

6  take, and for him to intervene in the criminal case is barred

7  by the forfeiture statute.

8          THE COURT:  Okay.

9          MR. ZWILLINGER:  Your Honor, if you would just let me

10 respond briefly to the question about a suit against Carpathia

11 for a return of property.

12         First of all, Carpathia had no contractual

13 relationship with Mr. Goodwin.  We were merely a service

14 provider to Megaupload.

15         And second, I think we are losing sight of the fact

16 that Carpathia's physical property which we're talking about in

17 this hearing, 1,100 servers, is being restrained.  We came to

18 this court to ask for a protective order.  We can't transfer

19 the servers to Mega.  The Government doesn't want them.  There

20 is a piece of physical property, we can't now destroy them

21 unless this Court gives us some authority to do so because it

22 seems to be at issue.  And the property of third parties is on

23 it.

24         So, we are in the same shoes as Mr. Goodwin in the

25 sense that we're a third party whose property interests are

1   being affected by the seizure in this case.

2          THE COURT:  I understand.  All right.

3          MR. SOFAER:  Your Honor, may I address the Court?

4          THE COURT:  Yes, sir.

5          MR. SOFAER:  Your Honor, Abraham Sofaer.  Thank you,

6   Your Honor.  Good morning.

7          THE COURT:  Good morning.

8          MR. SOFAER:  I think it's fair to say, Your Honor,

9   that not only was their a seizure in this case, our position is

10  that Mr. Goodwin's property, and it is property, continues to

11  be seized.  We cannot get access to that property.  And it is

12  property.

13         THE COURT:  But is the Government preventing you from

14  getting access?

15         MR. SOFAER:  Absolutely they are.  There is no

16  practical way to get that.

17         Your Honor, if you consider, consider what happened

18  in New Zealand and what the U.S. government must have

19  represented to the New Zealand government, that they would in

20  fact screen all the data they seized.  And that they would take

21  out all the irrelevant, irrelevant meaning either it was

22  proscribed data, protected data, or it was not relevant to the

23  proceeding.

24         And they must have made representations there that

25  they would be able to do that.  And they can do that here as

1    well, Your Honor.

2           We have not conceded, Your Honor, that the warrants

3    here are lawful.

4           THE COURT:  I know.

5           MR. SOFAER:  These warrants are highly questionable

6    based on any logic.  It is a revolutionary proposition, Your

7    Honor, the Government has put on this table, that these data

8    that they seized are not property.  That all we have is a

9    service contract.  They have essentially intruded an idea here

10   that blocks the reality.  The reality being data were put on

11   servers.

12          And this is a new world, Your Honor.  There is data

13   there of millions of people.

14          And, Your Honor, I might submit, at this hearing, and

15   Your Honor should have a hearing if there is any doubt

16   whatsoever about this, at this hearing, Your Honor, we are

17   going to ask the Government to tell the Court what their

18   reviews of the data show as to the amount of data that they

19   seized from people who were totally innocent users.

20          So, Your Honor, these are real questions that have to

21   do with the proper handling of information that has nothing to

22   do with the criminal conspiracy that this Government is

23   prosecuting.

24          If Your Honor has no questions, I appreciate the

25   opportunity.

1           THE COURT:  No, thank you.

2           MR. SOFAER:  Thank you.

3           THE COURT:  All right.

4           MR. ROTHKEN:  Your Honor--

5           THE COURT:  Yes, sir.

6           MR. ROTHKEN:  I would like to make a limited

7  appearance for a few statements.

8           THE COURT:  Yes, sir, go ahead.

9           MR. ROTHKEN:  Thank you, Your Honor.

10          Your Honor, a few things.  My name is Ira Rothken.

11          Your Honor, thank you for allowing me to make a

12  limited appearance.  And we did get your order earlier today in

13  which you did indicate that you will be hearing Megaupload's

14  motion to dismiss.

15          And in terms of timing, it seems as though there are

16  weighty issues that are related to both preservation as well as

17  consumer access.  And without getting into the details of our

18  negotiations with Judge Anderson, it seems like they begin and

19  end with funds, who is going to pay and how much is the budget,

20  and what could you do with that budget.

21          And so, in essence, the motion to dismiss is a

22  pragmatic way for us to try helping resolve that issue as well

23  as other issues.

24          So, in terms of timing, these issues may be obviated

25  if the motion to dismiss is granted.  Obviously, Megaupload

1    would still continue to engage with Judge Anderson and with the

2    other stakeholders and would look for a solution, not only for

3    data preservation for the criminal and civil cases, but also to

4    assist consumers in getting access to their data.

5         And when we know, if it is granted and we know what

6    kinds of funds are available, we would certainly negotiate what

7    portion of those funds would be used and how much things would

8    cost.

9         In terms of some of the points that you requested be

10   discussed today.  The domain name was indeed seized, it was

11   megaupload.com.  The domain name is usually tethered to IP

12   addresses.  And those IP addresses then point to the servers,

13   in this case it would be Carpathia.

14        There is a difference between seizing ownership of a

15   domain name--  And here, the Government seized a domain name

16   and they put up an advertisement for the Department of Justice

17   on the domain name, but they could have easily just continued

18   to point the domain name, even though they now own it to the

19   servers, and then consumers could have gotten back their data.

20        So, nothing stopped them from doing that.  They could

21   have continued to do that.

22        In terms of alternative domain names and being able

23   to sort of have a work-around, the sys admins, generally

24   speaking, were located in New Zealand.  Again, this is not me

25   testifying.  I am giving you a proffer.  They are the ones who

1    have sort of the password access.  They are the ones who would

2    be able to log in and change around the system so that other

3    domains could talk to it and so there would be security.  And

4    they were arrested and they were put in jail.  And they were

5    not in the position at that point to be able to assist.

6            And then, and this is something that we'll have to

7    get the documents on, but this is to the best of my memory, the

8    bail conditions that the United States through New Zealand

9    argued to the New Zealand courts for, were bail conditions that

10   prohibited the sys admins from working on Megaupload.

11           And so, that obviously created a problem in terms of

12   control, at least constructive control.

13           So, these are a number of issues that we were

14   listening to that we wanted to bring to your attention.  But at

15   the end of the day, we do believe that whether it is under

16   41(g) or whether it's under Brady or whether it's under a civil

17   litigation need for a preservation, they all unite to basically

18   say that the right thing to do is to preserve and, to the

19   extent feasible, give consumers access.  And we believe a large

20   part of this could be obviated by the motion to dismiss.

21           So, unless you have any other questions, that's it.

22           THE COURT:  I don't.  Thank you.

23           MR. ROTHKEN:  Thank you, Your Honor.

24           THE COURT:  Mr. Peterson--

25           MR. PETERSON:  Could I briefly respond to that, Your

1    Honor?

2           THE COURT:  Yes.

3           MR. PETERSON:  Just the first point about timing.  I

4    just want to make clear that it's the Government's position

5    that we do not believe that even if this Court grants the

6    motion to dismiss, that that will lead to a release of funds.

7    At least our position would be that it should not because the

8    funds that are currently restrained, regardless of the status

9    of an indictment or the service against Megaupload, could

10   continue to be restrained as assets of the individuals or as

11   substitute assets.

12          THE COURT:  Well, while I'll got you there, let's

13   talk about your theory that this is a service contract.  But

14   Mr. Goodwin isn't asking for the service to be reinstated.  He

15   is asking for his data back.  And that's property, right?

16          MR. PETERSON:  Well, I think it's a difficult

17   question.  I think, and not to give the Court a nonanswer, I

18   think there are certain rights that are similar to property

19   rights that adhere in the data that he has stored there, but I

20   don't think that it is the same.

21          For instance, if Carpathia went bankrupt tomorrow and

22   Mr. Goodwin filed a claim as an unsecured creditor into the

23   ones and zeros that are on the server platter where his data

24   was stored, much like Mr. Goodwin's counsel said, I do think

25   that's a new issue.  I'm not exactly sure how that issue would

1    be resolved.

2           Although, when you have millions of bits and bytes on

3    a single server, the server itself might cost a thousand

4    dollars or one dollar, and the claim apparently is that the

5    data on it could cost millions of dollars or be divided up by

6    millions of people, I do think that is a very difficult issue.

7           But it is not an issue that is unknown to the law in

8    the sense that that is the whole reason for an ancillary

9    proceeding in a seized asset, is that there may be multiple

10   creditors.  There could be secured creditors.  There could be

11   creditors of Carpathia that own those servers.  And how the

12   Court splits that up--

13          THE COURT:  But you're changing the argument back

14   again.  We have Mr. Goodwin, he wants his property back.  It's

15   data stored in a large system.  The system has been rendered

16   inoperable.  Carpathia can't put the--  They could put the

17   servers back up and running, but there is no domain name under

18   which third parties could access it, as Mr. Rothken has

19   suggested, that the Government could reinstate the ability of

20   the public to use the domain names if it so chose, and chose

21   not to permit that.

22          But really, if we're looking at a 41(g) hearing, it's

23   because Mr. Goodwin is looking for his property.  And then,

24   don't we have to go down the four-part test that has been used

25   in the Ramsden case and the CDT case, the Comprehensive Drug

1    <u>Testing</u> case out of the Ninth Circuit in 2010?

2          MR. PETERSON:  I don't think so, Your Honor.  And I

3    think there are a couple of factual differences between the

4    analogy that the Court is using, that this is property that is

5    placed somewhere.  And I think it is difficult in the digital

6    domain to conceptualize that issue, but the way the law

7    traditionally conceptualized that was a bailment where you

8    would give your property to another where it was held in a

9    bailment relationship and the bailor has rights and the bailee

10   has rights.

11         But this is not a bailment both because the terms of

12   service of Megaupload disclaim any rights by the user in that,

13   but also because bailment typically required exclusive access

14   or possession on the part of the bailee of the specific

15   property.

16         I think what Megaupload provided is more accurately

17   described as a service.  What Mr. Goodwin gave to Megaupload,

18   if anything, was a copy of property that he had.  And

19   Megaupload's service that it provided was a URL that if someone

20   was accessing the Internet, they could download a similar copy.

21   The copy that was stored by Megaupload never went anywhere, it

22   was never taken, it was not bailed by Mr. Goodwin to

23   Megaupload.  And that copying service is what Megaupload

24   provided.

25         And Mr. Goodwin's rights to that service are the same

1    as if he had contracted with any other business for a service

2    where he expected future performance.  Because if he had a

3    service contract to deliver certain goods every month, he would

4    still have a property interest in goods if he had already

5    purchased them.

6            Or if he had provided money to a person or to a

7    bankrupt business, he has an interest in the money that he has

8    provided.  I don't think there is a difference because it's

9    data.  And the way that that is resolved is all the creditors

10   get together or all the persons who provided those assets have

11   to find a way to resolve it.

12           And the access issue I think is a service issue

13   because it's not, we're not talking about a gate with a lock on

14   it.  We're talking about a technological infrastructure,

15   registering the domain, operating thousands of computers.

16   That's a service that is provided to customers of Megaupload,

17   but it is not a service the Government can provide or that the

18   assets or the seized assets should be used.

19           Because I think, as the Court pointed out, that's

20   actually the issue here.  The Government is not saying and has

21   not said, this cannot be done, that Mr. Goodwin is prohibited

22   from accessing his data.  We have simply said that the funds

23   that have been restrained or that are subject to forfeiture,

24   cannot be used at this time to effectuate that.

25           Because as I said earlier, if he is a general

1  unsecured creditor in Megaupload's assets, during the ancillary

2  proceeding he can assert that right.  And perhaps the Court at

3  that time will decide that the assets should be used for that.

4  But diluting or diminishing the assets at this time is

5  inappropriate because there hasn't been a final order of

6  forfeiture.  We're not aware of the scope of the number of

7  unsecured or secured creditors that may have rights.

8       Because even in the Wu case cited by Mr. Goodwin, the

9  burden is on the third party to assert that their possessory

10  interest in the seized property is greater than that of the

11  defendants.  And here I don't think that can be done--

12       THE COURT:  Doesn't he have an individual interest in

13  a need for the property?

14       MR. PETERSON:  I think that that portion of the test

15  of the four-part test that is described in Kane and the cases

16  that Your Honor discusses is probably met.  He has an

17  individual interest in that.  But the other three fail.  He has

18  not suffered irreparable harm.  His business interests,

19  whatever the costs of the services that he was going to provide

20  to his own customers, can be reimbursed to him.

21       He also has remedies in law, remedies in contract,

22  remedies in tort, potentially, or other remedies where he can

23  recover those assets that he has lost.

24       And then the fourth test was whether there was a,

25  described in his briefing, was whether there was a callous

1    disregard for Constitutional rights.  And as we pointed out,

2    where the Government lawfully acts pursuant to a warrant, no

3    court has ever found a callous disregard.

4         And his briefing on that was even inconsistent

5    because at one point in the Comprehensive Drug Testing case the

6    court said, the Government shows a callous disregard by taking

7    too much.

8         But here in fact, Mr. Goodwin's position is that we

9    showed that callous disregard by taking too little.  And that's

10   a very difficult thing, but the Government attempted to

11   navigate that concern by not taking his data.

12        And we don't believe that the seized funds can be

13   used at this time to pay to create the service to allow him to

14   reaccess it.  If anything, that should happen after the

15   forfeiture order is entered at the close of the case.

16        THE COURT:  All right.  Thank you, Mr. Peterson.

17        Well, I see that brought out--

18        THE COURT REPORTER:  Your Honor, I am having a

19   technical difficulty.  Could we take a two-minute break?

20        THE COURT:  Certainly.  All right, we are going to

21   take a two-minute break and finish up.  And we still have some

22   criminal matters to handle as well.

23        All right, we're in recess.

24        NOTE:  At this point a recess is taken; at the

25   conclusion of which the case continues as follows:

1          THE COURT:  Mr. Peterson, before I lose the thought,

2    when we were talking about the use of the forfeited assets to

3    be available for victims, would Mr. Goodwin be entitled to

4    relief in his position?  He is not alleging that his data has

5    been unlawfully infringed, right?  He is not like the motion

6    picture industry?

7          MR. PETERSON:  I agree.  I think in our view though,

8    he is at minimum an unsecured creditor of the business.  And in

9    the Fourth Circuit, unsecured creditors can make claims.  There

10   are other circuits where that's barred.

11         I don't want to opine now on how valid the Court

12   would find his claim, or how many unsecured creditors there

13   were, or at the end, depending on the amount of forfeited

14   assets, whether his claim would be, you know, that the Court,

15   there would be enough assets to actually provide him with

16   relief that we've talked about.  But that, too, does not mean

17   that a remedy at law is unavailable to him.

18         The other issue is, he is one person.  Now, if there

19   are other unsecured creditors, the reason why the ancillary

20   proceeding is the most efficient way to do that, although

21   perhaps not as efficient as Mr. Goodwin would like because it

22   will take awhile, is it allows for notice and all the

23   creditors, secured and unsecured, to file whatever interests

24   there are.  And then the Court to divide the pie of forfeited

25   assets to the extent that third parties have interests

1  appropriately.

2           And that's why the Government believes that the

3  appropriate time is at that time for claims such as that

4  because that is when the Court can evaluate the whole picture

5  at the end of the case.

6           And I think it's also the reason why 853 and 1960 bar

7  civil claims prior to the entry of that forfeiture order,

8  because it is the most fair.  And in the end, for all parties

9  involved, I think it is the most efficient.  Which isn't to say

10  it is as efficient as Mr. Goodwin would like it, but it is the

11  most efficient for all the creditors that may have third-party

12  interests in seized or forfeited assets.

13           THE COURT:  All right.  Thank you, Mr. Peterson.

14           All right, now I will hear--  Yes, go ahead.

15           MS. SAMUELS:  Thank you, Your Honor.  I would just

16  like to respond to a couple points, briefly, if I may.

17           First of all, to talk about funds for a second.  I

18  think that funds is something that we will have to hopefully

19  address at a Rule 41 hearing, if that is to happen.

20           First of all, I would just like to point out that all

21  of the funds were seized.  And at least some of Megauploads'

22  funds, or assets I should say, related to presumably legal

23  activity.  For example, Mr. Goodwin paid for legal service.

24           So, there can be some apportionment, I believe.

25           Second of all, under Rule 41(g), I think if it's

1    found after some kind of fact finding hearing that the

2    Government acted improperly, well then the Government would

3    have to pay.  Whether it is out of seized funds or just the

4    Government has to pay.  And so, I just don't think that that is

5    off the table.

6              But I think that's something we would need to

7    investigate.

8              The Government just talked about what was fair.  And

9    I think that's important because when we were talking about the

10   four factors under CDT, we kind of brushed over this idea of

11   callous disregard.  And I think there is some evidence of some

12   callous disregard.  First of all, we have heard that there were

13   essentially threats made to Carpathia.

14             I think the Government had knowledge of what its

15   actions were going to do.  And there was, whether it was

16   intentional or not, there was reason to know that lots of third

17   parties were going to have their property swept up in this.

18             And it's unfortunate that we're dealing with this now

19   because if we had dealt with it more efficiently at the outset,

20   perhaps we wouldn't all be here.  And I think that that is

21   important and comes full circle back to CDT, the CDT case,

22   which does a really nice job of kind of taking this idea of

23   digital property.  And that, of course, dealt more with privacy

24   as opposed to property rights.  But it's still important that

25   we look at how we actually use digital property now.

1          So, when we start attacking about whether it is a

2     bailor versus a bailee or a straight-up service contract, I

3     think it can't be overlooked that we all use digital property

4     every single day.  We all use cloud services, whether it is

5     Megaupload, whether it's Amazon, Apple, Google.  This is how

6     people all over the country and all over the world share

7     information and data and property.

8          And it's important that we think about the ways that

9     that makes sense within the legal framework as it now exists,

10    but, you know, with these new, these new technologies.

11         So, I am hopeful that that is something we will be

12    able to flesh out more in a Rule 41 hearing and if there is

13    ancillary briefing or whatever.  But I look forward to that.

14         And I thank you for your time.

15         THE COURT:  All right, thank you.

16         Mr. Rothken.

17         MR. ROTHKEN:  Thank you, Your Honor.  I will be

18    brief.

19         In terms of property, it's frankly an abstract

20    principle, but we begin with the notion that this case is an

21    indictment over intellectual property.  And the prosecutor did

22    put in there amended indictment that what was going on here was

23    a violation of intellectual property rights.

24         And so, on some level there is certainly some

25    property rights at issue in this case.

1          Now, we are here today because of this continuum from

2     a previous hearing that was brought by Carpathia that was

3     related to their issues on storage and payment for storage.

4     And during the course of the briefing, the United States has

5     indicated that they were not aware of any exculpatory evidence

6     that they didn't obtain through their mirroring process.

7          And the question that we really have for the United

8     States, if you would be kind enough to ask so we can get some

9     transparency just as a pragmatic point, is whether or not

10    they're aware if their mirroring process was able to go ahead

11    and copy Mr. Goodwin's content, which is clearly exculpatory

12    evidence, and have they went ahead and preserved it.

13         Or do we have to go ahead and start having a further

14    inquiry if there are other Mr. Goodwins.  And--

15         THE COURT:  Kind of a broad definition of exculpatory

16    evidence, I think.

17         MR. ROTHKEN:  Well, Mr. Goodwin using the services in

18    a lawful manner would be certainly a demonstration of

19    substantial noninfringing uses under the Sony doctrine.

20         THE COURT:  It would be an example of a noninfringing

21    use, correct?

22         MR. ROTHKEN:  Exactly, exactly.  And that would

23    certainly go towards an argument to be made to the jury on

24    that.

25         And in terms of victims, we heard the prosecutor

1    stand up and indicate that folks like Mr. Goodwin would be a

2    victim.  And if that's the case too, that would speak in terms

3    of the sister discussion on preservation, that all the server

4    data should be preserved.

5           So, whether you call folks victims or you call them

6    witnesses, that information will be there so that we wouldn't

7    be left guessing at the appropriate time if these things ever

8    ripen.

9           So, unless you have any other questions, that's all I

10   have, Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Rothken.  I

12   don't.

13          We will look at it a little further and we will issue

14   an order shortly moving the case along.

15          What's the status of the New Zealand extradition?  Is

16   it still an August decision?

17          MR. PRABHU:  The date is still August, August 6.

18   There have been some rulings, as the Court is aware.  Our

19   understanding is that it is likely all of those will be

20   appealed by either party.

21          So, we don't know if that date will stand.  We stand

22   ready to support whatever the New Zealand prosecutors do.

23          THE COURT:  Okay.  All right.  Then work on the

24   timing of the motion to dismiss and the briefing, and submit an

25   order.  I think I've indicated I'm here.  I am not available--

1  Well, I am here all, you know, end of July and August. And so,

2  get together on your schedules and I will hear that.

3       Yes, Mr. Rothken.

4       MR. ROTHKEN: Your Honor, in terms of scheduling, we

5  do have some constraints. There is an August 6 extradition

6  hearing, and we are going to send a contingent of U.S. lawyers

7  to New Zealand to assist on e-discovery, things of that nature.

8       It would be really helpful if we could set the motion

9  to dismiss hearing for Megaupload for July 20, which is the

10 first Friday after the briefing schedule that you have

11 outlined.

12      Now, I have not been able to solicit counsel's view

13 on that, but that would be a very efficient way for us to

14 handle this kind of schedule burden.

15      THE COURT: All right. Is that a problem?

16      MR. PRABHU: We have a lot of parties to survey. I

17 can get back to counsel.

18      THE COURT: All right, I am available. So, if you

19 can work it out, please do.

20      MR. ROTHKEN: Thank you.

21      THE COURT: All right. I appreciate all of your

22 input and the briefing. And I also apologize if anybody is

23 here because of my late notice that I was going to continue the

24 motion to dismiss portion of the argument until it had been

25 fully briefed. I have been in trial, and I just didn't get the

1    notice out adequately.  So, I apologize for that.

2              Have a good weekend and 4th of July.

3              Thank you all.

4        -------------------------------------------------
                          HEARING CONCLUDED

5

6

7

8

9

10

11

12

13

14

15

16

17              I certify that the foregoing is a true and

18        accurate transcription of my stenographic notes.

19

20

21                    /s/ Norman B. Linnell
                      _____
22              Norman B. Linnell, RPR, CM, VCE, FCRR

23

24

25